# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

-v-

YOMI T. JAGUNNA,
a/k/a "Donald S. Elam,"
a/k/a "Dselam"

**CRIMINAL COMPLAINT**

Mag. No. 08-7179

I, Heather Hendershot, being duly sworn, state the following is true and correct to the best of my knowledge and belief. Between in or about December 2007 and in or about July 2008, in the District of New Jersey and elsewhere, defendant YOMI T. JAGUNNA did:

## SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

Heather Hendershot, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
October 20, 2008, in Essex County, New Jersey

HONORABLE ESTHER SALAS
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

## ATTACHMENT A

### COUNT I

Between in or about December 2007 and in or about July 2008, in the District of New Jersey and elsewhere, defendant

YOMI T. JAGUNNA,
a/k/a "Donald S. Elam,"
a/k/a "Dselam"

did knowingly and intentionally conspire to transfer, possess and use a means of identification of another person without lawful authority, in a manner affecting interstate commerce, with the intent to commit, and in connection with, unlawful activity constituting a violation of federal law, namely, 18 U.S.C. § 1343, contrary to 18 U.S.C. § 1028(a)(7) and (b)(1).

In violation of Title 18, United States Code, Section 1028(f).

### COUNT II

Between in or about December 2007 and in or about July 2008, in the District of New Jersey and elsewhere, defendant

YOMI T. JAGUNNA,
a/k/a "Donald S. Elam,"
a/k/a "Dselam"

did knowingly and intentionally conspire with others to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, did transmit and cause to be transmitted by means of wire communications in interstate commerce, certain writings, signs, signals, and sounds, as described below, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349.

## ATTACHMENT B

I, Heather Hendershot, a Special Agent of the Federal Bureau of Investigation, have knowledge of the following facts based upon my investigation and discussions with witnesses and other law enforcement agents. Since this affidavit is submitted for the purpose of establishing probable cause to support the issuance of a complaint and arrest warrant, I have not included each and every fact known by the government concerning this investigation. All conversations referenced herein are set forth in substance and in part.

## BACKGROUND

1. At various times relevant to this Complaint, defendant Yomi T. JAGUNNA, a/k/a "Donald S. Elam," a/k/a "Dselam" (hereinafter "defendant JAGUNNA") spoke with co-conspirators using the cellular telephone assigned the telephone number (347) 262-6473, and communicated with others using the e-mail account dselam2000@yahoo.com. Defendant JAGUNNA used a Sprint Aircard registered to Donald S. Elam to access the Internet and his dselam2000@yahoo.com e-mail account.

## OBJECT OF THE CONSPIRACY

2. The object of the conspiracy was for defendant JAGUNNA and others to enrich themselves by acquiring personal and banking information of third parties and using that information to substantially deplete bank accounts, credit card accounts, and home equity line of credit accounts.

## MANNER AND MEANS

3. It was part of the conspiracy that defendant JAGUNNA, Co-Conspirator 1 ("CC1"), and others gathered information on potential victims through public databases, including county databases that maintained records of home equity loans.

4. It was further part of the conspiracy that CC1 and others contacted credit reporting agencies and used publicly derived information to fraudulently impersonate account holders. The credit reporting agencies would provide the co-conspirators with the victims' credit reports. The co-conspirators would often obtain victims' credit reports for free by ordering the free yearly credit reports that credit agencies are required by law to provide to consumers.

5. It was further part of the conspiracy that defendant JAGUNNA, CC1, and others shared stolen identity information by e-mail, fax or phone.

6. It was further part of the conspiracy that defendant JAGUNNA, CC1, and others would each focus on different elements of the fraudulent scheme at various times. At times, CC1 delivered lists of names and addresses to defendant JAGUNNA so that defendant JAGUNNA could add social security numbers to those lists. And at times CC1 and others made calls to financial institutions either to impersonate account holders or to obtain information from those

financial institutions in furtherance of the conspiracy.

7. It was further part of the conspiracy that, with the publicly available material combined with material obtained from the credit reports, CC1 and others contacted the banks at which the victims' accounts were located. Through persistent phone calls and social engineering, the co-conspirators persuaded unwitting customer service representatives to provide yet additional account information, to change account addresses, and to change passwords that could be used to gain on-line access to customer accounts.

8. It was further part of the conspiracy that, to avoid being detected, CC1 and others placed telephone calls to victim account holders' local telephone companies to report service disruption and request that all incoming calls be forwarded to another number. This practice allowed CC1 and others to circumvent bank attempts to authenticate requested transactions by calling the customer telephone number on file with the bank.

9. It was further part of the conspiracy that CC1 and others used a call forwarding service to obtain phone numbers that shared the area code of the customer whose account was to be compromised, thereby avoiding any suspicion that might result from a local customer being asked for his calls to be forwarded out of state during the alleged service disruption.

10. It was further part of the conspiracy that defendant JAGUNNA, CC1 and others used on-line access to check balances, change passwords, acquire additional account information, or redirect account statements away from true account holders by changing the customers' addresses with the bank.

11. It was further part of the conspiracy that Co-Conspirator 2 provided CC1 with addresses of vacant buildings, and that CC1 requested that banks send victim account holders' new checks to the vacant building.

12. It was further part of the conspiracy that CC1 and others substantially depleted the balances on the compromised accounts through wire transfers, ATM withdrawals, and checks drawn on the accounts.

13. Between in or about December 2007 and in or about July 2008 more than $2,000,000 was successfully removed as part of the conspiracy from victim accounts, while additional and unsuccessful attempts were made to remove more than an additional $2,000,000.

## USING THE PHONES AS PART OF THE CONSPIRACY

14. Between on or about May 8, 2008 and on or about June 6, 2008, the FBI intercepted wire communications occurring over a phone used by CC1. Through intercepted communications, the FBI learned that CC1 used the intercepted phone to discuss stolen identities and fraudulent transfers of funds from line of credit accounts.

15. Among the telephone numbers with which CC1 communicated was a number used by defendant JAGUNNA.

16. The following description of an intercepted call is based on a summary of the conversation:

On or about May 10, 2008, at approximately 12:32 p.m., CC1 received a call from defendant JAGUNNA. Defendant JAGUNNA confirmed that Co-Conspirator 3 ("CC3") sent him 39 names that were previously requested, as well as addresses associated with those names. Defendant JAGUNNA further confirmed that all the names and addresses were "good." CC1 and defendant JAGUNNA agreed on a plan to turn $300 into $2 million within six months.

## TRAFFICKING IN MEANS OF IDENTIFICATION: THE DSELAM E-MAIL ACCOUNT

17. Between in or about December 2007 and in or about May 2008, defendant JAGUNNA and CC1 exchanged more than thirty e-mails. The e-mails contained hundreds of names and addresses, some of which are affiliated with bank accounts that were successfully compromised.

18. On or about January 30, 2008, CC1 sent defendant JAGUNNA an e-mail containing names and addresses of a number of individuals, consistent with victims of identity theft. Later that same day, defendant JAGUNNA sent CC1 an e-mail containing the social security numbers and dates of birth for four of the individuals listed in CC1's prior e-mail.